NICOLA T. HANNA
United States Attorney
DENNISE D. WILLETT
Assistant United States Attorney
Chief, Santa Ana Branch Office
VIBHAV MITTAL (Cal. Bar No. 257874)
Assistant United States Attorney
8000 United States Courthouse
411 West Fourth Street
Santa Ana, California 92701
Telephone: (714) 338-3534
Facsimile: (714) 338-3708
E-mail: vibhav.mittal@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JAVED ASEFI,<br><br>Defendant. | No. SA CR 16-113-JLS-10<br><br>GOVERNMENT'S POSITION RE: SENTENCING<br><br>Hearing Date: February 23, 2018<br>Hearing Time: 9:30 a.m.<br>Location: Courtroom of the Hon. Josephine L. Staton |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorney Vibhav Mittal, hereby files its sentencing position.

This sentencing position is based upon the attached memorandum of points and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: February 9, 2018

Respectfully submitted,

NICOLA T. HANNA
United States Attorney

DENNISE D. WILLETT
Assistant United States Attorney
Chief, Santa Ana Branch Office

/s/
VIBHAV MITTAL
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

## TABLE OF CONTENTS


MEMORANDUM OF POINTS AND AUTHORITIES.............................. 1

I. INTRODUCTION........................................... 1

II. FACTUAL BACKGROUND..................................... 3

A. Defendant's Role in 16 Bribe Payments.................. 3

B. Defendant Attempted to Obstruct the FBI Investigation.... 4

C. Defendant Failed To Disclose His Criminal History In His Citizenship Application While Aware Of The Ongoing FBI Investigation............................................ 5

D. Defendant Violated The Terms Of His Pretrial Release In March 2017............................................... 7

E. Defendant Committed Perjury During His Trial Testimony... 8

III. ARGUMENT.............................................. 11

IV. CONCLUSION............................................ 16

# TABLE OF AUTHORITIES

## Federal Cases

United States v. Blinkinsop, 606 F.3d 1110 (9th Cir. 2010) ........ 15

United States v. Cantrell, 433 F.3d 1296 (9th Cir. 2006) ........ 12

United States v. Dunnigan, 507 U.S. 87 (1993) ........ 8

United States v. Mares, 402 F.3d 511 (5th Cir. 2005) ........ 15

United States v. Nichols, 464 F.3d 1117 (9th Cir. 2006) ........ 12

United States v. Ringgold, 571 F.3d 948 (9th Cir. 2009) ........ 16

United States v. Simmons, 501 F.3d 620 (6th Cir. 2007) ........ 16

## Secondary Sources

Ninth Cir. Model Jury Instruction 8.135 ........ 8

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I. INTRODUCTION

From at least 2010 until March 23, 2015, co-defendant Jose Lopez, Jr., ("co-defendant J. Lopez"), a clerk with the Superior Court of the State of California, County of Orange ("Orange County Superior Court"), accepted bribes to enter fraudulent minutes that made it appear a case had been resolved in a manner favorable to the person charged when, in truth and fact, no court proceeding or resolution had taken place. (CR 209 at 7-8.) This scheme affected approximately 1,034 cases, including 69 misdemeanor driving under the influence cases, 160 other misdemeanor cases, and 805 traffic-related infraction cases. (CR 209 at 4.) The scheme reached that volume because of the efforts of people like defendant Javed ASEFI ("defendant") that conspired with co-defendant J. Lopez and aided and abetted his receipt of bribe payments. Defendant played a key role in the payment of multiple bribes; defendant had his own traffic matter fixed and facilitated others illegally resolve their traffic-related matters, including one DUI matter. (PSR ¶¶ 33-43.) Defendant was involved in facilitating the payment of at least 16 bribes, including one for a DUI, totaling approximately $11,400. Evidence at trial supported the conclusion that defendant profited from this scheme, as some of the $11,400 went to defendant and defendant used his access to the corrupt clerk to build more favorable business relationships.

Unfortunately, defendant's criminal activity did not end with the bribery scheme. Co-defendant J. Lopez left the court in March 2015. In June 2015, defendant placed a call to co-defendant J. Lopez. Defendant learned the FBI was investigating the bribery

scheme. The FBI interviewed defendant about his involvement in September and October 2015. While the investigation was ongoing, defendant, a legal permanent resident, filed a naturalization application in November 2015 that contained various false statements made under oath about his criminal history. (PSR ¶ 45.) Specifically, defendant failed to disclose in his naturalization application his involvement in the bribery scheme at issue here as well as a prior criminal case where he was charged and convicted of assault and battery. (CR 357 at 30-32.) In that prior criminal case, defendant was placed in a diversionary program and the case was ultimately dismissed. Such criminal history was required to be disclosed in the citizenship application.

Less than two months before his May 2017 trial date in this matter, in late March 2017, defendant violated this Court's pretrial release order when he contacted a co-defendant indirectly and attempted to find out if the co-defendant was cooperating. (PSR § 47.) The evidence at trial also demonstrated how defendant engaged in obstruction of justice during the FBI investigation and committed perjury when he testified on September 5, 2017.

On November 2, 2017, the United States Probation Office ("USPO") issued a pre-sentence investigation report ("PSR"), calculating a guidelines range of 51 to 63 months based on a total offense level of 24 and a criminal history category of I. (CR 581.) In its letter to the Court, the USPO recommended a sentence of 51 months to be followed by three years of supervised release. (CR 580.)

Given defendant's offense conduct, defendant's limited criminal history, and the mitigating facts in his background, the government

believes the Court should impose a sentence of 51 months of imprisonment followed by a term of three years of supervised release.

## II. FACTUAL BACKGROUND

As the Court is well aware of the facts from the trial, the government only summarizes a portion of the facts for background.

### A. DEFENDANT'S ROLE IN 16 BRIBE PAYMENTS

Between roughly December 2011 and October 2014, defendant was involved in getting at least 16 matters pending before the Orange County Superior Court resolved with bribe payments (1 of which was for a DUI offense); the value of the bribes was approximately $11,400. Defendant helped, among others, his father, brother, and himself get traffic tickets dismissed. Karina Ducoulumbier (a customer from defendant's car repair shop) had five traffic tickets dismissed with defendant's help. Some like Ms. Ducoulumbier, Jerry Burch (a friend of a customer from defendant's repair shop), and Jianfeng Guo (the employer of a customer from defendant's repair shop) were not eligible for traffic school because of the many tickets they had; hence, with the bribe payments, Ms. Ducoulumbier, Mr. Burch, and Mr. Guo avoided the points from additional traffic infractions and the related higher insurance costs that deter further unsafe driving. Shortly after getting her fifth traffic ticket dismissed, Ms. Ducoulumbier's boyfriend, Barry Keene, had his DUI dropped to a "wet reckless" with defendant's assistance. Until the bribery scheme was uncovered, Mr. Keene paid over $1,000 less in fines to the Orange County Superior Court, avoided an automatic 6-month license suspension, and was placed on probation that only exposed him to 90 days jail if he violated (as opposed to 6 months

jail under the proper resolution). Because of Mr. Keene's bribe payment, a Tahl form with forged signatures was entered into the Orange County Superior Court's system. Many of the bribers (including Mr. Keene, Mr. Burch, and Mr. Guo) never met defendant during the scheme because someone else handled the payment to defendant for them.

Defendant obtained the resolution of these matters via co-defendant Juan Santillana ("co-defendant Santillana") who passed the bribe payments onto co-defendant J. Lopez. While matters were getting dismissed, defendant did not directly contact co-defendant J. Lopez. Defendant collected the cash from the bribers and then passed at least a portion of the cash along to co-defendant Santillana. The price that the bribers paid defendant varied, supporting the inference that defendant was taking a cut. For example, Mr. Burch paid $500 while defendant's brother only paid $300. Moreover, many of the bribers were customers of defendant's car repair business. Hence, part of the motivation for getting the tickets dismissed was to ensure people would bring him business to his repair shop. In addition, defendant told co-defendant Santillana that he made $2,000 from Mr. Keene's DUI matter. (RT 8/31/17: 94-95; CR 591 at 94-95.)[1]

**B. DEFENDANT ATTEMPTED TO OBSTRUCT THE FBI INVESTIGATION**

After co-defendant J. Lopez left the Orange County Superior Court in March 2015, defendant asked co-defendant Santillana for co-defendant J. Lopez's phone number so defendant's friends and family

---

[1] "RT" refers to the reporter's transcripts of proceedings and is followed by the date of the trial testimony and "CR" refers to the Clerk's Record and is followed by the docket number; all such references are followed by the applicable page references.

could point out co-defendant J. Lopez and not defendant. (RT 8/31/17: 101-02; CR 591 at 101-02.) Defendant admitted in his testimony that he asked for co-defendant J. Lopez's phone number. (RT 9/5/17: 81-82; CR 592 at 81-82.) In addition, defendant's phone records showed that he called co-defendant J. Lopez in June 2015.

Before co-defendant Santillana interviewed with federal agents in September 2015, co-defendant Santillana and defendant had discussed what they were going to say to law enforcement. (RT 8/31/17: 104; CR 591 at 104.) The plan was to tell agents that they knew somebody in the courts and that person was "some type of an attorney that fixes our tickets." (Id.) This was consistent with co-defendant Santillana's September 11, 2015 statement to law enforcement where he said that he paid co-defendant J. Lopez who co-defendant Santillana thought was an attorney in the courts. (RT 8/31/17: 102-03; CR 591 at 102-03.)

Defendant met with co-defendant Santillana and Hussein Razmi to discuss what they were going to say to agents or the people that were referred to co-defendant Santillana. (RT 8/31/17: 106, 144-45; CR 591 at 106, 144-45.) They planned to tell the agents that co-defendant J. Lopez fixed their tickets to protect themselves. (RT 8/31/17: 106-07; CR 591 at 106-07) Co-defendant Santillana and defendant discussed deleting text messages to get rid of evidence that could implicate them in the crime and avoiding communication. (RT 8/31/17: 164-66; CR 591 at 164-66.)

### C. DEFENDANT FAILED TO DISCLOSE HIS CRIMINAL HISTORY IN HIS CITIZENSHIP APPLICATION WHILE AWARE OF THE ONGOING FBI INVESTIGATION

On November 19, 2015, defendant submitted an application to become a United States citizen. In his application, defendant gave

false statements about his criminal history in response to multiple questions. (CR 357 at 30-32.)[2] Defendant did not disclose his involvement in the bribery scheme, despite knowing the FBI investigation was taking place and the state court's efforts to correct the fraudulently entered minutes. Moreover, he did not disclose his involvement in his prior assault and battery case even though the application advised him to disclose all records even those that had been "sealed, expunged, or otherwise cleared" and in cases where "anyone, including a judge, law enforcement officer, or attorney, [had] told [him] that [the case] no longer constitute[d] a record or told [him] that [he did] have to disclose the information." (Trial Ex. 5 at 16, attached as Exhibit 2.) The guilty plea form from defendant's assault and battery case, which defendant signed on December 9, 2011, advised him that a conviction for the assault and battery charges could result in a denial of naturalization (Trial Ex. 115, attached as Exhibit 3) and the judge on December 9, 2011, also advised defendant of the possible effect that the conviction could have on any naturalization proceedings (Trial Ex. 113, attached as Exhibit 4). Despite having these advisements, defendant never disclosed the 2011 case to immigration authorities in his naturalization application.

---

[2] Defendant also stated in the November 2015 citizenship application that he was single and never married; no mention is made of his wife in the application. (Trial Ex. 5 at 9, attached as Exhibit 1.) However, in the presentence report interview done on October 5, 2017, defendant stated that he and his wife wed in a ceremony at their mosque in 2002 and only recently had a civil ceremony at a city hall. (PSR ¶ 101.)

### D. DEFENDANT VIOLATED THE TERMS OF HIS PRETRIAL RELEASE IN MARCH 2017

On September 7, 2016, defendant's home was searched and he was arrested. As part of his bond conditions, defendant could not commit any crimes or contact any co-defendants. (CR 99.) On March 17, 2017, defendant saw co-defendant Santillana and his wife at a hearing of defendant's in this matter. (RT 9/5/17: 136; CR 592 at 136.) Co-defendant Santillana went to court with his wife that day because he believed there would be a hearing on motions filed by attorneys in this matter. (RT 8/31/17: 145-47; CR 591 at 145-47.) Defendant became concerned when he saw co-defendant Santillana at the March 17, 2017, hearing. (RT 9/5/17: 136; CR 592 at 136.) Defendant asked his friend, Ali Heidary, to send Shawn Tinoosh to find out why co-defendant Santillana was at the hearing. (RT 8/30/17: 197-98; CR 590 at 197-98.) Defendant was concerned that co-defendant Santillana was cooperating. (RT 8/30/17: 198; CR 590 at 198.) Defendant had told Mr. Heidary that he was not supposed to speak to co-defendant Santillana (evidencing defendant's knowledge of the no-contact order). (RT 8/30/17: 198-199; CR 590 at 198-99.) Because of defendant's concerns, Mr. Heidary asked Shawn Tinoosh to find out why co-defendant Santillana was at defendant's hearing, as Mr. Heidary and co-defendant Santillana were not on speaking terms and defendant was not permitted to talk to co-defendant Santillana. (RT 8/30/17: 197-200; CR 590 at 197-200.)

On March 22, 2017, Mr. Tinoosh went to co-defendant Santillana's place of business. (RT 8/31/17: 114-15; CR 591 at 114-15.) After making small talk about the car business, Mr. Tinoosh asked co-defendant Santillana about the "whole ticket-fixing thing."

(Id.) Co-defendant Santillana responded that he could not talk about those matters. (Id.) Mr. Tinoosh insisted that he understood that defendant could not talk to co-defendant Santillana personally but defendant would like to know "what's going on." (Id.) Mr. Tinoosh said that defendant was a "good guy" and the case was "BS." (Id.) Mr. Tinoosh said that defendant wanted to know if co-defendant Santillana was "going to talk." (Id.) Co-defendant Santillana again said he could not talk about these matters. (Id.) Then, co-defendant Santillana and Mr. Tinoosh went on to talk about the car business and returning Mr. Tinoosh's poker chips to Mr. Tinoosh (which co-defendant Santillana had in his garage from years ago). (Id.)

**E. DEFENDANT COMMITTED PERJURY DURING HIS TRIAL TESTIMONY**

Defendant perjured[3] himself when he testified that co-defendant Santillana told him at the start of his involvement in the scheme that, "In the future, if you get any speeding tickets, I know a very good attorney. He can help you out." (RT 9/5/17: 68-72; CR 592 at 68-72.) Defendant was suggesting to the jury that he did not knowingly join the criminal conspiracy. In essence, defendant's testimony was to support the argument that defendant held a good faith belief that an attorney was legitimately obtaining the

---

[3] "A witness testifying under oath or affirmation violates [the perjury] statute if she gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." United States v. Dunnigan, 507 U.S. 87, 94 (1993). The Ninth Circuit Model Jury Instructions provide that in order for a defendant to be found guilty of perjury, the government must prove that: (1) the defendant testified under oath; (2) the testimony was false; (3) the false testimony was material to the matters before the court; and (4) the defendant acted willfully, that is deliberately and with knowledge that the testimony was false. See Ninth Cir. Model Jury Instruction 8.135 (modified).

resolutions in the 16 matters he had referred to co-defendant Santillana. This part of his testimony was inconsistent with other portions of defendant's testimony, co-defendant Santillana's testimony and conduct, and the circumstantial evidence in the case. First and foremost, defendant's testimony was inconsistent with how defendant did legitimate business. Defendant admitted that when he referred people to legitimate business contacts he knew the name of the person he was providing the referral to and had met the contact in person. (RT 9/5/17: 98-99; CR 592 at 98-99.) In addition, defendant was not a novice to working with attorneys, as he had retained an attorney for an immigration proceeding in 1997 and an attorney for a bankruptcy proceeding in 2012. (RT 9/5/17: 134-135; CR 592 at 134-35.) Unlike for the "attorney" purportedly obtaining the resolutions at issue in this case, defendant knew his attorneys' names, had met with them, and had spoken to them. (Id.) Defendant also admitted that he knew co-defendant Santillana was a used car salesman (not an attorney) and he never told the people he referred to co-defendant Santillana that their money was going to a used car salesman (not an attorney). (RT 9/5/17: 100; CR 592 at 100.)

Moreover, co-defendant Santillana testified that he never told defendant that co-defendant J. Lopez was an attorney. (RT 8/31/17: 92-93; CR 591 at 92-93.) In fact, co-defendant Santillana testified that the cover-up story for the FBI, which he had discussed with defendant, was that they knew somebody in the courts and that person was some type of an attorney that fixes tickets. (RT 8/31/17: 104; CR 591 at 104.) Mr. Heidary's testimony also supported the conclusion that defendant perjured himself. Mr. Heidary (another person that worked with co-defendant Santillana to get tickets

dismissed) testified that he initially told the FBI that he thought an attorney was behind the scheme but later admitted that was not true. (RT 8/30/17: 185; CR 590 at 185.) The Facebook messages of Mr. Heidary (a friend of defendant's) from the scheme demonstrated that the dismissals were being done "unlawfully" because in those messages Mr. Heidary said he did not want to discuss ticket dismissals on Facebook. (RT 8/30/17: 191-94; CR 590 at 191-94.) Mr. Heidary testified that, during the scheme, he and defendant discussed the fact that the prices for the dismissals varied depending on the type of car the person drove. (RT 8/30/17: 188-90; CR 590 at 188-90.) Finally, the circumstantial evidence in the case (including the fact that defendant's text messages with Mr. Burch referred to defendant's connection as the "the guy"—not as Mr. Burch's attorney, no one ever met or spoke to the "attorney," no one knew the name of the "attorney," only cash payments were accepted, crumpled court documents were sent by text message as proof of the resolutions, inconsistent notices were sent to defendant, only cases in Orange County could be handled by the "attorney", prices varied by the type of car the briber drove and the relationship the briber had with defendant, and the fact that payments went to a used car salesman without any legal training) did not support defendant's testimony that he was told an attorney was behind this scheme and defendant, in good faith, believed that he was working with an attorney through a used car salesman to get his and other people's cases resolved.

Defendant perjured himself when he testified that he made no money on the DUI matter or traffic tickets. (RT 9/5/17: 79; CR 592 at 79.) Co-defendant Santillana testified that defendant made

$2,000 on the DUI case. (RT 8/31/17: 94-95; CR 591 at 94-95.) Moreover, this was corroborated by Ms. Ducolumbier's testimony where she said that defendant gave her money after Mr. Keene's DUI matter was recalled. Moreover, the variance in prices (including $500 for Jerry Burch who defendant did not know) supported the inference that defendant was taking a cut. People who defendant knew well, like his brother, or did business with defendant paid less, suggesting that defendant did not profit off people close to him or people who were his repair shop's customers (or at a minimum, profited less).

Defendant perjured himself when he testified that co-defendant Santillana grabbed his phone and deleted text messages, suggesting that he was an unwilling participant in the destruction of evidence. (RT 9/5/17: 83; CR 592 at 83.)[4] Co-defendant Santillana testified that he asked defendant if he was going to delete text messages to get rid of evidence that could implicate them in the crime. (RT 8/31/17: 165-66; CR 591 at 165-66.) Co-defendant Santillana testified that he did not force defendant to delete text messages and that he believed defendant deleted his text messages. (RT 8/31/17: 166; CR 591 at 166.)

In the end, the jury rejected defendant's testimony with its verdicts, finding defendant guilty of the substantive bribery counts.

**III. ARGUMENT**

The applicable guideline range in this case is 51 to 63 months. While not definitive, the Guidelines range provides the starting

---

[4] From defendant's testimony, it is undisputed that text messages between defendant and co-defendant Santillana from defendant's phone were deleted as part of the cover-up.

point for finding a reasonable sentence and must then be considered with the factors set forth in Section 3553(a). See United States v. Cantrell, 433 F.3d 1296, 1279 (9th Cir. 2006). To comply with the requirements of Booker, the district court must have sufficiently considered the Guidelines as well as the other factors listed in § 3553(a). This requirement does not necessitate a specific articulation of each factor separately, but rather a showing that the district court considered the statutorily-designated factors in imposing a sentence. United States v. Nichols, 464 F.3d 1117, 1125 (9th Cir. 2006) (quoting United States v. Knows His Gun, 438 F.3d 913, 918 (9th Cir. 2006)).

1. A 51-month sentence is reasonable in light of the nature and circumstances of the offense and defendant's history and characteristics

As defendant's counsel at the time put it, this bribery scheme "[harmed] the institution of the court, [shook] public confidence in it, and [harmed] the people of the County of Orange generally." (CR 183 at 7.) Because of the collective efforts of the defendants in this case, people avoided the proper penalties for driving under the influence cases, received lesser penalties, and had cases fraudulently dismissed. The cases at issue included drunk driving misdemeanors as well as infractions where people were driving over 100 miles per hour. Every person in the county interacts with the high-volume traffic court that heard these matters. This scheme attacked the integrity of the court system, which quite literally works to keep the Orange County streets safe.

Defendant was involved with the illegal resolution of traffic infractions and misdemeanors as part of this bribery scheme. The

total value of the bribes was approximately $11,400. This bribery scheme prevented the Orange County Superior Court and law enforcement from deterring such dangerous activity. Defendant has no criminal history points, as the previous assault and battery case was dismissed. (PSR ¶ 90.)

Defendant's criminal conduct is more troubling than the other defendants in this case in one material aspect: his criminal activity continued even while this case was pending. Many obstructed justice like defendant did to thwart the investigation into this bribery scheme. The trial demonstrated that this investigation and prosecution could only be successful with the truthful assistance of others. Certainly, the lead defendant is the most culpable defendant in the bribery scheme. However, only defendant submitted false statements in a citizenship application while aware of the ongoing FBI investigation, only defendant violated this Court's no-contact order to find out if a co-defendant was cooperating while pending trial, and only defendant perjured himself under oath in front of this Court and a jury.

That said, the mitigation in his background, including his difficult life in Afghanistan, supports the government's low-end recommendation.

Given his criminal activity here, minimal criminal history, and mitigation, the government believes that a 51-month sentence is warranted.

2. <u>A 51-month sentence is reasonable because it reflects the seriousness of the offense, promotes respect for the law, and provides a just punishment</u>

A 51-month sentence reflects the seriousness of defendant's involvement in the bribery scheme, false statements in a citizenship application while the FBI investigation was pending, and obstruction of justice during the investigation, while on release, and during trial. Defendant needs a sentence that will promote respect for the law. The government's recommendation also provides just punishment.

Therefore, the government believes a 51-month sentence is necessary to address the seriousness of the offense and promote respect for the law.

3. <u>A 51-month sentence is reasonable because it protects the public from defendant's crimes and affords adequate deterrence to criminal conduct</u>

Our court system is a vital branch of government. Traffic court provides a safety net for everyone that drives in Orange County. It is the one aspect of the justice system that nearly every person encounters. Defendant's crimes also affected the integrity of the immigration system. To become a citizen, the expectation is that a person will truthfully and completely disclose all criminal history in his citizenship application. Defendant fell far short of that requirement. Finally, defendant's crimes affected the integrity of a federal investigation and this prosecution. Such cases can only successfully be investigated and prosecuted with the truthful assistance of others (as evidenced by the government's case-in-chief). Efforts like defendant's to cover up his criminal

activity and contact a co-defendant have a chilling effect on a criminal investigation and prosecution.

For these reasons, the government believes that a 51-month sentence is necessary to protect the public and deter defendant specifically and others like him more generally.

4. A 51-month sentence is reasonable because it does not create unwarranted sentencing disparities

A sentence within the Sentencing Guidelines range may be the best way to satisfy this factor. See United States v. Mares, 402 F.3d 511, 518-519 (5th Cir. 2005). The government's recommendation represents the low-end of the applicable guideline range, and so is commensurate with what others in his position would receive. See United States v. Blinkinsop, 606 F.3d 1110, 1116 (9th Cir. 2010) (noting that a within-Guidelines sentence is generally reasonable in the "mine run of cases").

Given defendant's false statements in the naturalization application, his unique obstruction of justice during the investigation and the pendency of this case, and his perjury at trial, the sentences of his co-defendants provide little assistance in determining an appropriate sentence. If the evidence only showed that defendant acted as a "middleman" for the traffic matters, the government's recommendation would be far different and in line with some of his co-defendants. However, as the jury found, defendant went beyond simply funneling bribes to a corrupt court employee. As a result, the government submits that a sentence of 51 months is needed to avoid unwarranted sentencing disparities. This sentence will help ensure national uniformity with defendants that are similarly situated with defendant, the purpose of § 3553(a)(6).

United States v. Ringgold, 571 F.3d 948, 951-53 (9th Cir. 2009) (holding that Booker "did not extinguish the objective of ensuring nationwide consistency in federal sentencing"); see also United States v. Simmons, 501 F.3d 620, 623–24 (6th Cir. 2007) (holding that § 3553(a)(6) is concerned with national disparities among the many defendants with similar criminal backgrounds convicted of similar criminal conduct but a district judge may exercise her discretion and determine a defendant's sentence in light of a co-defendant's sentence).

## IV. CONCLUSION

For these reasons, the government respectfully recommends that defendant be sentenced to 51 months of imprisonment followed by a term of three years of supervised release.